```
                 IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF FLORIDA
                          MIAMI DIVISION
                 CASE NO. 1:19-cr-20674-DPG-1


UNITED STATES OF AMERICA,

          Plaintiff,                    July 3, 2021
                                        11:00 a.m.
          vs.

JOSHUA RYAN JOLES,

          Defendant.                    Pages 1 THROUGH 28
_____


                     TRANSCRIPT OF SENTENCING
                      VIA THE ZOOM PLATFORM
              BEFORE THE HONORABLE DARRIN P. GAYLES
                    UNITED STATES DISTRICT JUDGE


Appearances:

FOR THE GOVERNMENT: UNITED STATES ATTORNEY'S OFFICE
                    WALTER M. NORKIN, AUSA
                    99 Northeast 4th Street
                    Miami, Florida 33132


FOR THE DEFENDANT:  TACHE, BRONIS, CHRISTIANSON & DESCALZO, PA
                    MARISSEL DESCALZO, ESQ.
                    150 Southeast Second Avenue, Suite 600
                    Miami, Florida 33131


COURT REPORTER:     Yvette Hernandez
                    U.S. District Court
                    400 North Miami Avenue, Room 10-2
                    Miami, Florida 33128
                    yvette_hernandez@flsd.uscourts.gov
```

```
 1          (Call to order of the Court, 11:00 a.m.)

 2          COURTROOM DEPUTY:  United States of America v. Joshua

 3   Ryan Joles, Case Number 19-20674, Criminal.

 4          Counsel, please state your appearances, starting with

 5   the Government.

 6          MR. NORKIN:  Walter Norkin for the Government.  Good

 7   morning, Your Honor.

 8          MR. KELLER:  Zachary Keller for the Government.

 9          MS. DESCALZO:  Good morning, Your Honor.  Marissel

10   Descalzo on behalf of Mr. Joshua Joles, and Mr. Joshua Joles is

11   present with me by Zoom.

12          THE COURT:  All right.  And from Probation?

13          PROBATION OFFICER:  Good morning, Your Honor.

14   Danielle Sylvester-Pierre on behalf of US Probation.

15          THE COURT:  All right.  Good morning to everyone.

16          We're here today for Mr. Joles's sentencing.  I do

17   want to ask Mr. Joles some preliminary questions about

18   proceeding by Zoom.

19          Mr. Joles, would you please raise your right hand and

20   be sworn.

21     JOSHUA RYAN JOLES, DEFENDANT, SWORN

22          THE COURT:  All right.  You may put your hand down.

23          Would you please state your full name.

24          THE DEFENDANT:  Joshua Ryan Joles.

25          THE COURT:  And your current age?
```

```
1            THE DEFENDANT:  Thirty-eight.

2            THE COURT:  What is your highest level of education?

3            THE DEFENDANT:  High school, and I took several

4    college courses.

5            THE COURT:  Are you currently under the influence of

6    any alcohol, narcotics, or medication?

7            THE DEFENDANT:  No, Your Honor.

8            THE COURT:  Have you suffered from or have you been

9    diagnosed with a mental illness?

10           THE DEFENDANT:  No, Your Honor.

11           THE COURT:  Today's proceeding is a sentencing

12   hearing, as I'm sure you're aware.  That is the kind of

13   proceeding that would normally happen in person, meaning in the

14   courtroom, in the presence of the judge and with the attorneys

15   for both sides and the Probation officer, the court reporter

16   and anyone else who would like to attend.  But because of the

17   COVID-19 pandemic, when anyone has requested that we proceed

18   remotely, we've been doing them remotely, so long as the

19   defendants agree.  Do you understand that?

20           THE DEFENDANT:  Yes, Your Honor.

21           THE COURT:  And have you discussed with your attorney

22   proceeding today by Zoom, as opposed to waiting to appear in

23   person?

24           THE DEFENDANT:  Yes, Your Honor.

25           THE COURT:  And has she answered all the questions
```

1    that you may have had regarding how to proceed in this case?

2                THE DEFENDANT:  Yes, Your Honor.

3                THE COURT:  And after speaking to your attorney, is it

4    your desire to proceed today by Zoom?

5                THE DEFENDANT:  Yes, Your Honor.

6                THE COURT:  Do you have any questions for either your

7    attorney or me about proceeding today by Zoom?

8                THE DEFENDANT:  No, Your Honor.

9                THE COURT:  All right.

10               So I've reviewed the Presentence Report, as well as

11   the objections to the report that were filed yesterday at

12   Docket Entry 378 -- those are the objections to the Final

13   Presentence Investigation Report -- also, Sentencing Memorandum

14   filed at Docket Entry 376, which contains a number of letters

15   on the Defendant's behalf.  I know for the other defendants

16   that I've already sentenced, when there are objections, the

17   Government filed responses, as well as -- actually, a response

18   to the memoranda.  But because of the late filing, I assume

19   that's why that was not done, Mr. Norkin.

20               Let me just tell you where my only issue is.  I've

21   already made some findings as far as the codefendants.  And my

22   court reporter is on leave and unavailable.  So prior to today,

23   I couldn't review the transcript specifically as to my previous

24   findings, and I don't want to do anything contrary to what I've

25   already decided.

1        So perhaps -- Ms. Sylvester-Pierre, there were similar

2   objections to what was made before.  Do you recall the specific

3   findings I made?  And then I'll, of course, ask you, Mr. Norkin

4   and Ms. Descalzo, the same questions later.  But ...

5        PROBATION OFFICER:  As to the guidelines, Your Honor,

6   you did not apply sophisticated means or sophisticated

7   laundering to any of the other codefendants who have been

8   sentenced so far.

9        THE COURT:  Okay.  What about the basic offense level?

10  That calculation -- did I alter that at all?

11       PROBATION OFFICER:  Yes, Your Honor.  Because

12  sophisticated -- the adjustment for sophisticated means is

13  included in the base offense level.  The adjustment for

14  sophisticated laundering is included as a specific offense

15  characteristic.

16       So the base offense level was 33 or will be 33,

17  without sophisticated means -- I'm sorry.  The base offense

18  level will be 34 without sophisticated means.  The adjusted

19  offense level, without sophisticated laundering, will be a 36.

20  And with acceptance of responsibility, the total offense level

21  will be 33.

22       THE COURT:  Okay.  And Mr. Norkin, is that the

23  guideline calculation that the Government is recommending or is

24  it something different?

25       MR. NORKIN:  We are recommending a level 31 as the

```
 1    adjusted guidelines offense, which would carry a range of 108
 2    to 135.  Not, frankly, because we disagree with Probation.
 3    Their calculation not including a sophisticated means comes out
 4    at 33, but the Government made a mistake in the Plea Agreement
 5    with Mr. Joles.  We didn't have the benefit of Mr. Salemi's PSR
 6    at that time that Plea Agreement was exchanged.  And so we're
 7    not disagreeing with how -- other than sophisticated money
 8    laundering and sophisticated means, we're not disagreeing with
 9    Probation's calculation, but we think the fair thing to do
10    would be to apply level 31 because that's what the parties
11    envisioned in the Plea Agreement.
12            THE COURT:  And what accounts for that difference?
13            MR. NORKIN:  There's an enhancement for -- I believe
14    it was the 670 offense -- that went into -- went -- when the
15    Government made the calculation, we treated the two counts as
16    separate.  We calculated the money laundering as one and we
17    calculated the 670 offense as separate.  But there is a
18    provision in the money laundering offense that says you apply
19    that enhancement to the money laundering when they're together,
20    and the Government overlooked that, frankly.
21            THE COURT:  Okay.  So meaning you overlooked that for
22    the codefendant?
23            MR. NORKIN:  We overlooked it for -- for -- I think we
24    overlooked it for all of them.  But it became clear once people
25    started getting sentenced that that was the right way to do it.
```

1    It's just that when the Government and Mr. Joles exchanged Plea

2    Agreements, the Government was still making that error.

3            THE COURT:  Okay.  Sorry.

4        (Pause in proceedings.)

5            THE COURT:  So looking at the guideline calculation,

6    can you just walk me through this, where that -- I'm looking

7    at -- starting with Paragraph 120, where those -- can we just

8    walk through step by step what the difference is here.

9            MR. NORKIN:  Yeah.  It ends up being a two-level

10   difference, but I will pull that up in one second.

11           THE COURT:  All right.

12       (Pause in proceedings.)

13           MR. NORKIN:  Your Honor, if I may, can I start with

14   what's in the Plea Agreement?  Because I think it's easier to

15   discern.  We did spell it out in the Plea Agreement, what the

16   Government viewed was going to be the guidelines.

17           MS. DESCALZO:  Mr. Norkin, I can help you here, if you

18   would like.  I think I understand what the issue is.

19           Your Honor, when we calculated the guidelines, I think

20   that what the mistake is -- the specific offense

21   characteristics under 1956, which adds two levels, we didn't

22   contemplate that.  Because we believed that we were calculating

23   the guidelines not under 1956; is that right, Mr. Norkin?  So

24   we had six, plus 24, plus four for product in the stream -- in

25   the market.  Isn't that right?  We did calculate the four

1    levels for under 670.

2              MR. NORKIN:  Yes.  I believe that's correct.

3              THE COURT:  Okay.  Just a moment.

4              So -- and in looking at Paragraph 120, there is the

5    six plus 24 levels based on the loss amount, and then the four

6    levels because the Defendant was employed by or was an agent of

7    an organization in the supply chain.  So the parties are in

8    agreement as to those three, correct?

9              MR. NORKIN:  Yes.

10             MS. DESCALZO:  I believe so, Your Honor.

11             THE COURT:  All right.  And so that is 34.  And then

12   the sophisticated means, if I remove that, as I've done with

13   the codefendants, that would be, in Paragraph 20, as

14   Ms. Sylvester-Pierre said, a base offense level of 34, correct?

15             MS. DESCALZO:  Yes, Your Honor.

16             THE COURT:  Okay.  Then in Paragraph 121 -- well, in

17   Paragraph 122, there is the sophisticated laundering

18   enhancement, which I've not applied and I won't apply here.  So

19   the other -- the only other two levels is this 1956(h)

20   enhancement in Paragraph 121.

21             MS. DESCALZO:  Correct, Your Honor.  And that is what

22   we did not account for when we wrote the Plea Agreement -- or

23   when the Government wrote the Plea Agreement.

24             THE COURT:  Okay.  And I'm looking at Mr. Salemi's

25   Presentence Report where that was included.  And

1      Ms. Sylvester-Pierre, did I apply that enhancement to his

2      guidelines?

3            PROBATION OFFICER:  Your Honor, I would have to check

4      his report, but I do believe that that enhancement was applied.

5      If you give me a moment, I can pull it up and see.

6            THE COURT:  Okay.

7            MS. DESCALZO:  It was applied, Your Honor.

8            THE COURT:  Okay.

9         (Pause in proceedings.)

10           THE COURT:  I know Ms. Sylvester-Pierre is looking,

11     but I'm looking at the Plea Agreement.  It does recommend an

12     enhancement under 1956.

13           PROBATION OFFICER:  And Your Honor, I apologize.  I

14     didn't know you were still waiting on me.  I thought since

15     counsel responded that that was it.  But Defense counsel is

16     correct and you're correct; it was applied.  Mr. Salemi's total

17     offense level was a 33.

18           THE COURT:  Okay.  And that same enhancement was

19     contemplated by the Plea Agreement.  So I just want to be

20     clear.  Mr. Norkin, you're saying that the Government is now

21     reconsidering that enhancement?  I didn't quite understand what

22     you were saying earlier.

23           MR. NORKIN:  We're not reconsidering.  And we're not

24     suggesting that the Probation calculation is wrong.  I'm merely

25     suggesting that when Defense counsel and the Government were

1    engaging in plea negotiations, for whatever reason, we had

2    calculated this to come out at 31 rather than 33.  And so to

3    give the Defendant the benefit of the doubt here, the

4    Government is advocating that the Court find that 31 is the

5    applicable level, as opposed to 33, even though 33 is correct.

6    I'm just concerned that the Defendant entered the guilty plea

7    under a different view or where the guidelines were going to

8    come out.  That's all.

9          THE COURT:  Okay.  Well, I can vary -- if this is the

10   correct calculation, I can always vary downward to account for

11   that.  But because there are Defense objections, I guess, why

12   don't we go through what's left, Ms. Descalzo, and ...

13         MS. DESCALZO:  I appreciate it, Your Honor.  We don't

14   have to waste your time.  If the Court agrees that -- if the

15   Court -- I understand that the correct offense level under the

16   guidelines is 33.  Regardless, the Government is going to

17   recommend a sentence even below that of 103 months, even below

18   the level 31 that we had contemplated.  So I really don't think

19   I can rest on my papers.  You can, you know, overrule all my

20   objections and we can move on.

21         THE COURT:  Okay.  So I've obviously sustained some of

22   the objections with regard to the two sophisticated means

23   enhancements.  Otherwise, I find that the guideline

24   calculations are correct, which leaves us with a total offense

25   level of 33, while I understand the parties contemplated a

1    lower number, but I'll obviously consider that.  So the

2    objections will be sustained in part and overruled in part.

3         Okay.

4         MS. DESCALZO:  Thank you, Your Honor.

5         THE COURT:  So Ms. Sylvester-Pierre, with a total

6    offense level of 33, criminal history category of I, where does

7    that leave us as far as the Defendant's guideline range?

8         PROBATION OFFICER:  Your Honor, the Defendant's

9    advisory guideline imprisonment range is 135 to 168 months.

10        THE COURT:  Okay.  Thank you.

11        And what is the Government's recommendation as to an

12   appropriate sentence?

13        MR. NORKIN:  Your Honor, the Government's

14   recommendation is a sentence comparable to Mr. Salemi, who

15   received 103 months.

16        If I can just address Ms. Descalzo's Sentencing

17   Memorandum.  We're not in significant disagreement about

18   Mr. Joles or his positive qualities or, you know, his merits

19   that way.  The Government even agrees that Mr. Joles has shown

20   remorse and there are comparisons and contrasts that you could

21   make between Mr. Joles and the other defendants.

22        But the Government's view for why a sentence closer to

23   what Mr. Salemi received is appropriate is because, number one,

24   almost everything that Mr. Salemi sold went through LLC and

25   Mr. Joles.  Mr. Joles was requesting -- well, basically told,

1    you know, Mr. Salemi that he could sell as much as Mr. Salemi

2    could provide.  And the remorse that Mr. Joles has expressed

3    now should be tempered a little bit with the consideration that

4    this is a scheme that went on for five years, with Mr. Joles

5    and LLC acting as an enabler for the other co-conspirators.

6    The merchandise would not have been able to get to pharmacies

7    without the ability to pass through a company like LLC.

8         Mr. Joles obviously saw that the pedigrees that were

9    being submitted were false and pointed out errors to be

10   corrected, which enabled the scheme to continue.  And Mr. Joles

11   was the last person of the people charged in the Indictment to

12   plead guilty.

13        Again, it's not saying that he's not remorseful.  And

14   I have seen, I guess, some of the same things that the

15   Defendant talks about in the Sentencing Memorandum and agree

16   that he is remorseful.  But that has to be tempered a little

17   bit with the facts of the case and the fact that Mr. Joles was

18   the last person to plead from this Indictment.

19        THE COURT:  You used Mr. Salemi as a comparator.  Why

20   him as opposed to any of the other defendants?

21        MR. NORKIN:  From the Government's view, both

22   Mr. Salemi and Mr. Joles were central to the scheme, without

23   whom the scheme wouldn't have worked.  You had people like

24   Mr. Alvarez, who was obtaining pills and cleaning pills.  But

25   without having the outlets to go up the chain to make these

1    pills legitimate, they would have ended up just street-level

2    deals and nothing more.  And so when you have the people who

3    are more involved on the (audio distortion) who give an air of

4    legitimacy to the sales, that's a crucial part of the scheme.

5            It's not a one-to-one comparison, at least as far as

6    the guidelines are concerned.  For example, Mr. Salemi did

7    receive an enhancement for leadership that does not apply to

8    Mr. Joles.  And so there may be a difference that way.  But by

9    the same token, as far as Mr. Alvarez, the guidelines were

10   funny for him as well.  He ended up getting lower guidelines

11   because he was not a -- someone who was operating within the

12   supply chain, within the pharmaceutical supply chain.  He was

13   operating outside of it.  And so there was an enhancement that

14   did not apply to him that does apply to Mr. Salemi and

15   Mr. Joles and some of the other defendants.  And so, for those

16   reasons, we view Mr. Joles as more similar to Mr. Salemi than

17   Mr. Alvarez.

18           THE COURT:  Okay.

19           All right.  Counsel?

20           MS. DESCALZO:  Your Honor, I'm going to tell you why

21   Mr. Joles is different from Salemi.  And that's role,

22   recruitment, money.

23           Mr. Salemi was running crews in Miami.  Mr. Salemi was

24   recruiting people to clean up these prescription bottles.

25   Mr. Joles has nothing to do with that and knew nothing about

1  it.

2       Money.  Mr. Salemi, Mr. Alvarez and everyone in Miami

3  made a whole lot more money than Mr. Joles did.  Mr. Joles was

4  essentially a glorified employee.  He was making his sales

5  salary plus commission.  While it was a lot of money, Your

6  Honor -- but, in this case, compared to the other defendants,

7  it was not a lot.

8       The Government says that Mr. Joles was crucial to this

9  scheme.  I would venture to say that the Government will call

10  every single person in this scheme crucial.

11       Salemi got a role enhancement.  Mr. Joles did not.  I

12  think that that is important.  And it's an important

13  distinction because that would put Salemi at a level 35.  And

14  the Government -- and Your Honor varied downwards to 103 for

15  Salemi.  And I'm asking for a similar variance for Mr. Joles.

16       While we do not at any point claim that Mr. Joles is

17  innocent, we do -- and we pointed this out in our memo -- that

18  Mr. Joles is distinct and his conduct is distinct.  He was --

19  had no knowledge of crews cleaning up bottles and buying

20  prescriptions from people on the street and he didn't know that

21  until he was charged.  And I think Norkin can agree to that.

22       And honestly, Your Honor, Mr. Norkin also brings up

23  the fact that Mr. Joles was the last one to plead guilty.  And

24  a lot of that, Your Honor, had to do with me because there was

25  so much discovery in this case, and I did not want Mr. Joles to

1    plead guilty until I had reviewed with him every single piece

2    of discovery.  Because I wanted to make sure -- because we did

3    not know -- and neither did Mr. Joles know -- a lot about what

4    was happening in this scheme.  And I think that he needed to

5    get familiar with that, so he can be in a position to fully

6    have knowledge of a guilty plea.  So I think he is different.

7         He's also a lot younger than the other defendants,

8    Your Honor.  And I think that he was naive when he got into

9    this business.  And he was driven to this business, he was

10   taught a certain way, and he was in it for a while before he

11   realized that everything he was doing was wrong.  Which is to

12   say he should have gotten out and he didn't.  And he's pleading

13   guilty because of that.  But he was taught the wrong way.  And

14   he didn't know it was the wrong way until red flags started

15   popping up.

16        And those red flags were, yes, there was prescription

17   bottles that didn't have the right medicine in it; yes, there

18   was prescription bottles that had, you know, labels falling

19   off.  But in the wholesale -- Mr. Joles was taught that in the

20   wholesale distribution of pharmaceuticals business these were

21   normal occurrences.  It wasn't until the conduct was repeated

22   so often that Mr. Joles really realized that something was

23   wrong.

24        So I think he is different and I think that he -- I

25   don't think that he should be compared to Mr. Salemi.  Like I

1    said, Mr. Salemi was top of the food chain.  And he was -- you

2    know, he was running several businesses that were doing this.

3    And I compared him to Frank Alvarez only because Frank Alvarez

4    got a 70-month sentence.  But I don't even think he was

5    comparable to Frank Alvarez, who was on the street recruiting

6    people, cleaning bottles, and running stash houses.  That's

7    very different than what Mr. Joles was doing.

8            THE COURT:  Okay.  I'm looking at the people I've

9    sentenced, and I'm trying to recall -- Mr. Diaz had an 87-month

10   sentence, which was slightly higher than -- well, about a year

11   higher than Mr. Alvarez.  But what was Mr. Diaz's role?

12           MR. NORKIN:  Mr. Diaz had a -- he was basically the

13   front person for a corporation that Mr. Salemi bought in Puerto

14   Rico.  His -- part of the reason he had lower guidelines were

15   also, again, the numbers were lower.  He was not involved in

16   the scheme for the same duration of time.  And so the loss

17   amount table had come out at a lower guidelines level because

18   his involvement was more limited.

19           But I would -- you know, if we're comparing roles, I

20   would agree that Mr. Joles is similar, as far as being somebody

21   who is the name and the face of a corporation.

22           THE COURT:  I'm looking at the Presentence Report.

23   Mr. Joles was involved in the scheme, as I understand it, about

24   five years.  Mr. Diaz, it appears to have been about the same

25   or maybe even six years, 2013 to May 2019.

```
1          MR. NORKIN:  I think that's just the timing -- I don't
2     believe --
3          (Pause in proceedings.)
4          THE COURT:  I'm looking at several Presentence
5     Reports.  This one was Mr. Salemi's.  It said from early 2013
6     to May 2019 Mr. Diaz was involved in the criminal activity.
7     I'll just skip back to Mr. Joles's report.
8          (Pause in proceedings.)
9          MR. NORKIN:  Your Honor, you know what?  I apologize.
10    I've confused Mr. Diaz and Mr. Paiz.  It was Mr. Paiz who was
11    the corporate face of the Puerto Rican company and involved for
12    a shorter period.  Mr. Diaz worked with Mr. Alvarez in the
13    processing of the pharmaceuticals, the getting them in Miami,
14    obtaining apartments.
15          THE COURT:  Okay.
16          MR. NORKIN:  So he was involved for the same time
17    period but he -- he was not a corporate owner.
18          THE COURT:  Right.  And the difference between
19    Mr. Joles and Mr. Paiz is what?
20          MR. NORKIN:  Mr. Paiz was involved for a shorter
21    period, with less -- with the table of loss having his
22    guidelines come out lower.
23          THE COURT:  Okay.  Give me just a moment.
24          (Pause in proceedings.)
25          THE COURT:  So why isn't Mr. Paiz a more appropriate
```

```
 1    comparator here than Mr. Salemi?

 2           MR. NORKIN:  Part of it just has to do with

 3    involvement and knowledge.  Mr. Paiz was involved for a shorter

 4    period of time.  He only knew a limited amount as far as the

 5    operation from the side of the Puerto Rico perspective, and

 6    that's why his guidelines came out lower.

 7           Mr. Joles was kind of higher up the food chain, as the

 8    corporation that stood between the co-conspirators and the

 9    products getting to the retail pharmacies.

10           THE COURT:  Okay.  All right.

11           All right.  Ms. Descalzo?

12           MS. DESCALZO:  Your Honor, I have my opinions and they

13    differ from Mr. Norkin.  Mr. Paiz was in the scheme about a

14    year less than Mr. Joles, according to the Indictment and the

15    PSR.  And Mr. Paiz was running Mr. Salemi's Puerto Rico

16    operation.

17           Like Mr. Paiz, Mr. Joles knew nothing about the Miami

18    operations.  He just understood that he was buying from

19    Mr. Salemi.  And Mr. Joles, while he was the face of LLC

20    Wholesale, I think Mr. Norkin can agree that Mr. Joles was a

21    minority partner.  He had a minority share.  I believe he was

22    placed in that position as the fall guy and other people were

23    pulling the strikes.

24           So I think that that is a very different -- again,

25    very different from a Alvarez, a Salemi, and a Diaz.  I mean,
```

1    these people were on the streets.  They were recruiting.  They

2    had stash houses.  That is not Mr. Joles.  And I just don't

3    think we can compare him.  And I don't even think we can

4    compare him to Paiz, who was in Puerto Rico.  And while he

5    exited -- he was there for a shorter period of time, he was

6    essentially Salemi's partner.  And -- you know, number two.

7             THE COURT:  Okay.  Is there -- I'm sorry.

8             Mr. Paiz's loss amount was significantly less than

9    Mr. Joles.  It was less than $25 million.

10            Okay.  There are obviously -- before I turn to the

11   Defendant, there are also a number of people that are here for

12   the Defendant's behalf.  Do you want to recognize who those

13   people are, Ms. Descalzo?

14            MS. DESCALZO:  I do, Your Honor.  And thank you.

15            And I just want to note for Your Honor that while

16   Paiz's loss was 25 million, I think it's important to note that

17   Mr. Joles's forfeiture was 2.75 million, which is much less

18   than everybody else.  So he benefited a lot less than the

19   others.  I just want to put that on the Judge's -- on the

20   Court's radar.

21            THE COURT:  Okay.

22            MS. DESCALZO:  Your Honor, we've submitted 23 letters

23   on behalf of Mr. Joles.  Present to support him are his

24   parents, his sister, and his long-time partner Kristen Landry.

25   They are not going to speak because Your Honor has -- we're not

```
1    going to waste the Court's time.  Your Honor has their letters.
2    I'm sure you've read them.  But Mr. Joles does want to address
3    the Court.
4              THE COURT:  Okay.  Mr. Joles, what would you like to
5    say?
6              THE DEFENDANT:  I stand before the Court, the lawyers,
7    and my family, and a lot of shame and remorse.  Growing up, my
8    parents instilled a hard work ethic and integrity in both my
9    sister and myself.  We pride ourselves in being the first ones
10   in and the last ones out every day we go to work.
11             I never finished my college degree.  That created
12   limitations for me.  When I was first introduced into the
13   pharmaceutical world, I saw it as a road to better my life.  I
14   thought pharmaceutical sales would create opportunities, and it
15   did.  I worked hard and listened to a person I thought was a
16   father figure to me and a mentor.
17             At a certain point, I did lose my way.  I started to
18   feel a lot of pressure to perform and sell more
19   pharmaceuticals.  I turned a blind eye to things I knew were
20   completely wrong, things I knew my parents would never be proud
21   of.  When the red flags arose, I ignored them and I pushed
22   forward.  I did things that were wrong.  I truly am sorry for
23   the damage that I have caused.  I am ashamed of myself, my
24   actions, and mostly the shame that I brought forth to my family
25   and friends.
```

1        From the time I was indicted, I have done a lot of

2   soul-searching.  I have tried to make this wrong right by

3   accepting complete responsibility for my own actions.  I know

4   that I will never get in trouble with the law again.  I know

5   I -- that I will make this wrong right.  I have been humbled by

6   this experience.  Please have mercy on me, Your Honor.

7        THE COURT:  All right.  Thank you, sir.

8        Is there anything else, Ms. Descalzo, before I

9   proceed?

10       MS. DESCALZO:  No, Your Honor.  Thank you.

11       THE COURT:  All right.  The Court has considered the

12   statements of the parties, the Presentence Report, which

13   contains the advisory guidelines and the statutory factors set

14   forth in Title 18, United States Code, Section 3553(a).

15       While the Defendant may be able to pay some nominal

16   fine, I don't find one is warranted here, especially

17   considering the amount of the forfeiture.  And I just want to

18   clarify, Mr. Norkin, there is no restitution; is that correct?

19       MR. NORKIN:  Yes, Your Honor.

20       THE COURT:  So the Government has agreed to a

21   below-guideline sentence.  The issue really is the amount.  And

22   there are a number of factors for the Court to consider.  Of

23   course, the statutory factors set forth in 3553, but also the

24   unique circumstances of the given case as it pertains to that

25   individual defendant.

1    I note the Defendant has one misdemeanor prior, but no

2  felonies.  And he obviously has a lot of support from family

3  and friends.  I mean, I balance that, of course, with the

4  significance, of course, of this offense and the extended

5  period of time over which it occurred.

6    One important factor for the Court to consider is the

7  issue of not having any unwarranted sentencing disparities, as

8  I've already sentenced several co-conspirators.  The problem,

9  of course, is that this is not an exact science and we've had

10  this discussion today to figure out:  "Well, how does this

11  Defendant's actions compare to others'?"

12    But understanding it's not an exact science, and

13  considering the Defendant's relative culpability, balanced with

14  his lack of a criminal history, with the significance of the

15  offense, I think I've been able to fashion an appropriate

16  sentence.

17    It is the judgment of the Court that the Defendant,

18  Joshua Ryan Joles, is committed to the Bureau of Prisons for a

19  term of 76 months.  This term consists of 60 months as to Count

20  2 and 76 months as to Count 3 of the Superseding Indictment,

21  which shall be served concurrent with one another.

22    Upon his release from imprisonment, the Defendant

23  shall be placed on supervised release for a term of three years

24  as to each of Counts 2 and 3, which will be served concurrent

25  with one another.

1          Within 72 hours of his release, the Defendant shall

2     report in person to the Probation office in the district where

3     he is released.

4          While on supervised release, the Defendant shall

5     comply with the mandatory and standard conditions of supervised

6     release, which include not committing any crimes.  He shall be

7     prohibited from possessing a firearm and ammunition and other

8     dangerous devices.  He shall not unlawfully possess a

9     controlled substance and he shall cooperate in the collection

10    of DNA.

11         The Defendant shall also comply with the following

12    special conditions:  A substance abuse evaluation and any

13    treatment deemed necessary, a mental health evaluation and

14    treatment deemed necessary, a financial disclosure requirement,

15    a self-employment restriction, the no new debt restriction, a

16    permissible search, the related concern restriction, the

17    association restriction, and he shall pay his outstanding

18    special assessment which the Court hereby imposes in the amount

19    of $200, which shall be paid immediately to the United States,

20    which reflects $100 for each count of conviction.

21         In sum, the Defendant's total sentence is 76 months of

22    imprisonment to be followed by three years of supervised

23    release, with the standard conditions and the special

24    conditions I've previously mentioned, and a $200 special

25    assessment.  The Court finds that sentence to be sufficient but

1    not greater than necessary for the reasons that I've discussed

2    here today.

3           The Defendant's right, title, and interest in the

4    property identified in the preliminary order of forfeiture,

5    which is reflected at Docket Entry 368, will be incorporated by

6    reference into this judgment.

7           Now that sentence has been imposed, does the Defendant

8    or counsel object to the Court's findings of fact or the manner

9    in which sentence was pronounced?

10          MS. DESCALZO:  No objection, Your Honor.

11          MR. NORKIN:  No objection on behalf of the Government.

12          THE COURT:  Mr. Joles, you have the right -- I'm

13   sorry.  Did I interrupt someone?

14          MR. NORKIN:  Just saying no objection from the

15   Government either.

16          THE COURT:  Okay.  Mr. Joles, you have the right to

17   appeal your sentence imposed, unless you waived that right

18   pursuant to your written Plea Agreement.  Any Notice of Appeal

19   must be filed within 14 days after entry of the formal

20   judgment.

21          If you are unable to pay the cost of an appeal, you

22   may apply for leave to appeal in forma pauperis, meaning at no

23   cost to you.

24          Have the parties discussed a surrender date?

25          MR. NORKIN:  No, Your Honor.  But the Government does

1   not object to a delayed surrender for Mr. Joles after he's

2   designated.  I believe other defendants are set to surrender on

3   September 28.  We can put in that same timeline and come back

4   to the Court if that doesn't work.

5           THE COURT:  Okay.  Is that what you're requesting,

6   Ms. Descalzo?

7           MS. DESCALZO:  Your Honor, we were going to request 90

8   days.  But if you want to set it for September 28th, and we can

9   come back to the Court.  But Mr. Joles intends to surrender

10  within those 90 days.  He's not going to delay his surrender.

11          THE COURT:  Okay.  All right.  We'll -- all right.

12          Mr. Joles, you shall surrender for service of your

13  sentence at the institution designated by the Bureau of Prisons

14  on September 28th of this year by noon.  If you do not receive

15  a designation before September 28th, you shall surrender to the

16  United States Marshals Service for the Southern District of

17  Florida at the Ferguson Courthouse by noon on September 28th.

18  But again, that's only if you do not receive a designation.  Do

19  you understand that?

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  Probation -- Ms. Sylvester-Pierre,

22  Probation shall retain the Defendant's passport until you

23  verify his surrender?

24          PROBATION OFFICER:  Yes, sir.

25          THE COURT:  Anything else from the Government for

```
1    today?

2              MR. NORKIN:  No, Your Honor.

3              THE COURT:  Is there other counts against the

4    Defendant?

5              MR. NORKIN:  There are other counts.  The Government

6    moves to dismiss them at this time.

7              THE COURT:  All right.  That motion is granted.

8              Anything else on behalf of Mr. Joles?

9              MS. DESCALZO:  Yes, Your Honor.  We would request a

10   recommendation for RDAP program.  I believe it's also in his

11   PSR.  And we would also request designation to the Tucson

12   prison camp.

13             THE COURT:  All right.  I'll recommend RDAP -- well,

14   first, is there any objection from the Government to those

15   recommendations?

16             MR. NORKIN:  No, Your Honor.

17             THE COURT:  All right.  I'll recommend RDAP.

18             And that's the Tucson, Arizona camp?

19             MS. DESCALZO:  Yes, Your Honor.

20             THE COURT:  All right.  I'll recommend it if he

21   qualifies.

22             MS. DESCALZO:  Your Honor, he lives in Phoenix,

23   Arizona, so he probably does.  Thank you.

24             THE COURT:  Okay.  Okay.  If there's nothing else,

25   then we'll be in recess.
```

1          Thank you.

2          MS. DESCALZO:   Thank you, Your Honor.

3      (Proceedings concluded at 11:46 a.m.)

```
 1    UNITED STATES OF AMERICA      )

 2    ss:

 3    SOUTHERN DISTRICT OF FLORIDA  )

 4                    C E R T I F I C A T E

 5          I, Yvette Hernandez, Certified Shorthand Reporter in

 6    and for the United States District Court for the Southern

 7    District of Florida, do hereby certify that I was present at

 8    and reported in machine shorthand the proceedings had the 3rd

 9    day of July, 2021, in the above-mentioned court; and that the

10    foregoing transcript is a true, correct, and complete

11    transcript of my stenographic notes.  Please note:  This

12    hearing occurred during the COVID-19 pandemic and is therefore

13    subject to the technological limitations of reporting remotely.

14          I further certify that this transcript contains pages

15    1 - 28.

16          IN WITNESS WHEREOF, I have hereunto set my hand at

17    Miami, Florida this 30th day of August, 2021.

18

19                        /s/Yvette Hernandez
                          Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
20                        400 North Miami Avenue, 10-2
                          Miami, Florida 33128
21                        (305) 523-5698
                          yvette_hernandez@flsd.uscourts.gov
22

23

24

25
```